Dennis ROBINSON and Dale Robinson, d/b/a Robinson Excavating Company, Plaintiffs–Respondents,

v.

Rick POWERS, d/b/a Powers Construction Company, Defendant–Appellant.

and

Freeman Hospital, Defendant.

No. 15849.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 5, 1989.

Walter E. Williams, Joplin, for defendant-appellant.

HOGAN, Judge.

Plaintiffs Dennis and Dale Robinson, excavating contractors, brought this action in three counts against defendant Rick Powers, a general contractor, and Freeman Hospital of Joplin. The action was based on a construction contract by the terms of which Rick Powers (whom we shall refer to as the defendant) undertook to build an office center for the Freeman Hospital according to drawings and specifications prepared by Joplin architects. A blueprint of the site plan indicates, if our calculations are correct, that the office building is an L-shaped structure which occupies approximately 10,800 square feet just south of McIntosh Circle Drive in the south part of the city of Joplin.

The construction contract, prepared on standard AIA forms which have been modified, indicates it was drawn up in June 1986, although neither the precise date of the contract nor the total contract price appear in the document laid before this court. Shortly before bids were due on the contract, defendant Powers solicited Dennis Robinson and his son Dale, who operated the Robinson Excavating Company, to do the "site work" or "dirt work" necessary to prepare the building site for construction. The site work consisted of excavation and filling, or "cutting and filling" so as to bring the building pad and the surrounding parking lot to grade. The proposed elevation of the building pad itself was 1,016 feet.[1] As the defendant has accurately put the matter in his brief, the elevation of the terrain varied greatly across the building site, and in order to bring the elevation of the building pad and the surrounding area to that specified, it was necessary to lower or "cut" some areas and to fill others. The plaintiffs were experienced excavation contractors.

During his initial meeting with the plaintiffs, defendant gave plaintiffs the site plan and "told [plaintiff] that he was looking for a total and complete excavation price for that project." Plaintiff Dennis Robinson testified that he, his son and Powers "[d]iscussed the site and the nature of the work to be done; and we took the prints and the specs, took them home and studied them." Subsequently, the plaintiffs offered to do the excavation work for $20,000. The plaintiffs were the only excavators on the job. At some time after the work had been begun, a written subcontract was tendered to the plaintiffs. This contract, received in evidence as plaintiffs' exhibit "B," recites an agreement by the plaintiffs to "site clear and grub, dispose of tree limbs, stumps; site [and] building cut [and] fill; undercut footings [and] slab as specified" and to do certain other work for the sum of $20,000. This contract, or subcontract, was not sent to the plaintiffs for some time after work had been commenced and was never signed by or on behalf of either party.

A few days after the parties' initial discussion, plaintiffs began work on the building site. As the defendant recalled, the Robinsons moved on the site and started work on August 6, 1986. The site work progressed and on August 20, plaintiff Dale Robinson submitted a request for payment in the amount of $12,600, representing 70 percent of the work bid less a 10 percent retent. Plaintiffs' evidence was that both the defendant and the architect approved this request for payment.

Controversy developed at some time after August 20th when it appeared there was a possibility there would not be enough fill dirt unless additional dirt was

1. "Elevation," in context, means feet above sea level as shown by U.S.G.S. surveys.

imported. Whether there was an actual shortage of dirt for fill purposes was a matter of controversy on trial. Plaintiff Dennis Robinson testified that "after we had worked there about 20 days straight, it was discussed on the job that there wasn't enough dirt to complete the job." The "lack of dirt" was explained in part by plaintiff Dennis as follows (using a site drawing, apparently, to make his point):

"Q. Now, this particular site, it's true is it not that a gully ran through the—

A. Right there where the dish is in the middle. Right in the middle of the building. Right in the middle of the building.

Q. Right here?

A. No. Middle of the building, the L, the L.

Q. All right.

A. You're getting close.

Q. You point—

A. In the middle of the L. This is your gully coming right up through the middle.

Q. All right. The gully ran through here, and you can see some grading at lines there that shows—

A. Yes, sir.

Q. —it got as low as about 18 feet below the building site; is that true?

A. Yes, sir. Yes, sir.

Q. Now, when you had the pad completed and graded to level, that gully was not fulled [sic]; was it? Well, let's get it up where everybody can see it.

A. This pad, when we had it completed, we were filled out to a point about in here, the edge we lacked dirt. At the building area the pad was complete, they had run the final inspection on the testing and had accepted it."

The defendant argues, and there was some evidence tending to show, that additional fill dirt could have been imported to fill up the "gully," but according to the defendant, he and his construction superintendent discovered that approximately 2,000 yards of fill would be required to bring the grade to the proper elevation as shown on the original plans. Plaintiff Dale Robinson, according to the defendant, agreed. Several possibilities were discussed; it was finally determined, as the defendant recites the facts, that the building pad would be lowered to avoid the importation of fill. After the building pad had been lowered 18 inches, plaintiff Dennis Robinson "showed up on the job" and took the position that he was entitled to extra compensation for the additional work involved in lowering the pad. When the defendant refused to agree to Robinson's demand for additional compensation, Robinson "pulled his people off the site."

The plaintiffs filed a petition in three counts. In the first count, plaintiffs pleaded the execution of an express contract between defendant, as prime contractor, and Dennis Robinson, as owner of the Robinson Excavating Company. Plaintiffs pleaded a breach of the contract and damages in the amount of $29,327.50. In the second count, plaintiffs sought to impress a mechanic's lien upon the completed office center. In the third count plaintiffs sought recovery of $26,872.50 in quantum meruit. Defendant Powers filed an answer and counterclaim. Defendant Freeman Hospital, the owner, also filed an answer and counterclaim. Freeman's counterclaim was voluntarily dismissed prior to trial. On May 17, 1988, the cause was tried to the court without the intervention of a jury. On June 7, the trial court found for plaintiffs Robinson and against the defendants on Counts I and II. It was ordered that plaintiffs have judgment against defendant Powers in the amount of $14,000 plus interest at the rate of 9 percent per annum from and after August 20, 1986; that a mechanic's lien be impressed upon the completed office building and that plaintiffs take nothing upon Count III of their petition. It was further ordered, among other things, that defendant Powers take nothing upon his counterclaim against the plaintiffs. Defendant Powers has appealed. We conclude we must affirm the judgment.

■ A few observations concerning the scope of our review are appropriate. This is a court-tried case. We review the case pursuant to Rule 73.01(c) and the dictates of *Murphy v. Carron*, 536 S.W.2d 30, 32[1–

3] (Mo.banc 1976). We affirm the judgment of the trial court unless: 1) there is no substantial evidence to support it; or 2) the judgment or decree is against the weight of the evidence, or 3) the trial court has erroneously declared or applied the law. We may not set the decree or judgment aside on the ground it is against the weight of the evidence unless the record generates a firm belief that the decree or judgment is wrong. We must further bear in mind that in a case tried to the bench, the trial court is the arbiter of fact and judge of the credibility of the witnesses; it may believe or reject all or any part of a witness' testimony, even if that evidence is uncontradicted. *In re Estate of Danforth*, 705 S.W.2d 609, 611 (Mo.App.1986); *Scott v. Dowling*, 636 S.W.2d 176, 180 (Mo.App. 1982); *Marrs v. Marrs*, 628 S.W.2d 950, 951 (Mo.App.1982). Consequently, a party having the burden of persuasion may fail to carry that burden in a court-tried case even if his proof is in part documentary and is uncontradicted. *McComas v. Umlauf*, 641 S.W.2d 809, 813 (Mo.App.1982); *Scott v. Dowling*, 636 S.W.2d at 180. A further principle to be borne in mind is that in bench-tried cases, a correct decision will not be disturbed because the court gave a wrong or insufficient reason therefor. *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318[12] (Mo.banc 1964); *Gruetzemacher v. Billings*, 348 S.W.2d 952, 955 (Mo.1961); *Reed v. Foulks*, 675 S.W.2d 695, 697–98 (Mo.App. 1984).

In this court the defendant has briefed and argued two assignments of error. His first point is that the trial court erred in finding that the plaintiffs were entitled to recover the sum of $14,000 because there was no evidence to support a finding that the defendant's refusal to pay additional compensation for lowering the building pad was a breach of contract. This is true, it is argued, for three reasons: 1) the parties agreed upon a written contract and there was no change order issued as required by the subcontract; 2) the evidence showed that the building pad was lowered for the benefit of the plaintiffs, and there was no evidence that the defendant or the owner received any benefit from lowering the pad,

and 3) the defendant's statement that he would not pay additional compensation was not a material breach of contract which would relieve the plaintiffs from their obligation to perform. The respondent has filed no brief.

Avoiding tangential issues, we believe the trial court could very well have found there was a contract between the plaintiffs and the defendant, but not the contract for which the defendant contends. The defendant insists that the contract between the Robinsons and Powers was the contract embodied in plaintiffs' exhibit "B," entitled "Sub–Contract Agreement." This instrument recites that it is agreed by and between the defendant and the plaintiffs that "The Sub-contractor agrees to furnish all material and perform all work necessary to complete the Freeman Office Center for Freeman Hospital located on 3400 block of McIntosh Circle, Joplin, Mo."

The second paragraph defines the subcontractor's duties more specifically, thus: "... to promptly begin said work as soon as notified by [defendant], and to complete the work as follows: Site clear and grub, dispose of tree limbs, stumps; site [and] building cut [and] fill; undercut footings [and] slab as specified; strip site [and] salvage blackdirt if any. All this per division 2 sitework sections I II and III. Rock excavation [$]70.00 [per cubic yard] as defined in specifications." This contract required the subcontractor to acquire necessary insurance, to pay all taxes upon the materials furnished, and specifically provided in the fifth paragraph:

"No extra work or changes under this contract will be recognized or paid for, unless agreed to in writing from the Contractor."

This contract also refers to and perhaps incorporates other documents by interlineation. Between the fourth and fifth paragraphs, the following language appears: "See attached addenda to this subcontract" and "See explanation attached on owner purchasing materials." The consideration recited is $20,000 in monthly progress payments, the said amount to be paid as follows: "90% of all labor and material which

has been placed in position by said Sub-contractor, to be paid on or about the 20th of the following month, except the final payment, which the said Contractor shall pay to the said Sub-contractor within 30 days after [final completion of the work]."

The "addendum" referred to adds to the obligations of the subcontractor. The subcontractor is required to follow a progress schedule or be subject to "liquidated damages in the amount of [$]200.00 per calendar day for non-conformance." Subcontractors and materials suppliers are required to inform themselves of the progress schedule and to request any updated progress schedules. The "addendum" also gives the defendant the right to cancel the subcontract on notice. The "explanation attached on owner purchasing materials" is not made a part of plaintiffs' contract in the record before us.

■ We agree with the proposition that signature is not always essential to the binding force of an agreement, and whether an unsigned writing constitutes a binding contract usually depends on the intention of the parties. *Collins v. Swope*, 605 S.W.2d 538, 540 (Mo.App.1980); *Sanders v. DeWitt*, 579 S.W.2d 707, 711[1] (Mo.App.1979). And, as this court observed in *Collins*, 605 S.W.2d at 540:

"'Intention' is a state of mind. Seldom are the intentions of [the] parties capable of direct proof and, ordinarily, such intentions are determinable only through logical deduction from proven facts. The trier of the facts, be it [a] court or [a] jury, usually decides the question of intention."

■ In our view, the testimony of plaintiff Dennis Robinson and defendant Rick Powers is too ambiguous and contradictory to demonstrate an intention to be bound by the unsigned contract tendered to us as plaintiffs' exhibit "B," the substance of which we have just recited. The defendant calls our attention to plaintiff Dennis Robinson's testimony in response to interrogation by the trial court. Plaintiff Dennis referred to his "exceeding" the parties' contract, whereupon the trial court asked:

\* \* \* \* \* \*

"... What contract is that?

A. The document that we had both verbally agreed on.

Q. And what is the number of that document?

A. Exhibit B I believe.

\* \* \* \* \* \*

Q. Are you referring to Plaintiff's Exhibit B, the subcontract agreement dated the 5th of August, 1986, with the addenda attached to it as your contract?

A. That was the verbal agreement. Yes."

Other testimony from plaintiff Dennis Robinson was equivocal to the point of being contradictory. At another point during the trial he was asked about the addenda to the subcontract, and testified thus:

\* \* \* \* \* \*

"Q. Now, on the back of your subcontract agreement, Exhibit B, there's an addendum on there. Are you familiar with that?

A. Yes, sir.

Q. That was attached to the contract that was sent to you; wasn't it?

A. I don't believe it was. I don't remember seeing it till a later date.

Q. Well, do you remember I asked you about that in your deposition, I asked you to produce that document?

A. Well, I don't remember it being part of the original contract, the original paper that I seen."

Dennis was also asked about the extra work for which he made claim, and answered thus:

"A. He asked for additional work and at the time that I was on the site he said I didn't have a contract, so I presumed I was working by the hour.

Q. [Defendant] never agreed to pay you any extra whatsoever on the job, Mr. Robinson; did he?

A. *He didn't sign the contract, and I didn't sign the contract so I presumed we was working by the hour.*" (Our emphasis.)

\* \* \* \* \* \*

In addition to this sort of equivocation, there was evidence that plaintiffs started to work on the project about August 4, 1986. The proposed subcontract was not sent to the plaintiffs' office until they had been working for several days, and Dennis Robinson[2] "didn't see the contract for probably two weeks." We need not clutter the record with the defendant's testimony; it is even more diffuse and equivocal than the plaintiffs' evidence. Our conclusion is that the parties' reached some agreement concerning the excavation work but to reiterate, the evidence does not compel a finding that the parties entered into the contract pleaded by the plaintiffs. No specific findings were requested and none were volunteered and we must consider the fact issues—including the terms of the oral contract—as having been found in accordance with the result reached. Rule 73.01(a)(2); *Freeman v. Taylor*, 620 S.W.2d 1, 2–3 (Mo. App.1981).

The evidence in this case would justify a finding that the plaintiffs met with the defendant, took the prints and specifications "home" and calculated the amount of dirt to be moved. As plaintiff Dennis described his method of calculation, "if you take the amount of the cut and the amount of fill, and the area you're covering, and then you divide it out, you come up with the yardage figure." Dennis could not remember the total yardage involved, but he had offered to do all the excavation or "site work" required for the sum of $20,000. Dennis calculated the cost of moving dirt at "approximately $2 a yard" so a trier of fact might conclude that the substance of the contract between the plaintiffs and the defendant was that the plaintiffs would move—cut and fill—10,000 cubic yards of dirt and the defendant would pay them the sum of $20,000 for doing so.

■ Having said as much, we need not comment further on the defendant's contention that the defendant was under no obligation to pay for extra work because no written order was issued as required by the subcontract. We do not disagree with the proposition that when a construction contract requires a written change order, there is no right to recover for extra work without such a writing or a waiver thereof by the owner. *Herbert v. Brooner Construction Co. v. Golden*, 499 S.W.2d 541, 547 (Mo.App.1973). However, as we have held, the trier of fact could have concluded that the contract tendered as plaintiff's exhibit "B" was not the parties' contract and the parties' agreement contained no provision for extra work.

■ A further assignment of error is that Powers did not breach the contract between him and the plaintiffs because the evidence showed that the building pad was lowered for the benefit of the plaintiffs and there was no evidence that the general contractor or the owner received any benefit from lowering the pad.

There is no doubt that the site plan (defendant's exhibit 3) required the plaintiffs to level the building pad at 1,016 feet above sea level, and this levelling operation required the plaintiffs to fill a gully which ran across the building site. There is evidence suggesting that as the excavation work progressed, plaintiff Dale Robinson became concerned that extra fill dirt would be required to bring the building pad to grade, and it was agreed that the pad might be lowered to avoid importing fill dirt from another location. There was, however, testimony from plaintiff Dennis Robinson and other witnesses that the want of fill material was caused by the defendant's failure to mark the property lines and stake the site elevation properly. The defendant did not deny that preliminary marking and staking were necessary, but his evidence was that once the topsoil and brush had been stripped from the building site his employees set grade stakes and he received no complaint from Robinson that the boundaries of the building site and the various elevations were not properly staked. A trier of fact could reasonably have concluded that the plaintiffs' lack of fill dirt was caused by the defendant's failure to mark and stake the building site properly.

---

**2.** Plaintiff Dale Robinson did not testify at the trial. His failure to appear is not explained.

[redacted] If the trial court concluded that the lack of fill dirt was caused by the defendant's failure to prepare the site for excavation rather than plaintiffs' miscalculation of the amount of dirt which would have to be moved to complete the excavation, then the court might have concluded, contrary to the defendant's contention, that the defendant's breach of contract made additional work necessary. There is a promise implied in every contract not to prevent or hinder performance by the other party and a breach of this implied promise constitutes a breach of contract. *Hough v. Jay-Dee Realty and Investment, Inc.*, 401 S.W.2d 545, 549 (Mo.App.1966); *Studer v. Rasmussen,* 80 Wyo. 465, 344 P.2d 990, 996–97[2] (1959) (discussing owner's failure to prepare construction site for excavation as a breach of contract); 11 S. Williston, Contracts § 1296, p. 58 (3d ed. 1968). The defendant's argument that the evidence requires the conclusion that the building pad was lowered solely to accommodate the plaintiffs is without merit, as is his further argument that the defendant's failure to pay for the extra work could not be considered a material breach of contract.

The defendant's final point is that the trial court erred in awarding plaintiffs the sum of $14,000 because the plaintiffs' damages should have been the contract price of $20,000 less the amount which was expended by the defendant to finish the contract.

This argument is based on the premise that there was no breach of contract by the defendant, and therefore defendant was entitled to "complete" performance by the plaintiffs. The defendant also argues it is clear that the contract price of $20,000 must be reduced by the amount spent by him in completing the excavation work.

The validity of this argument, of course, depends on the terms of the parties' contract. The parties' position, as we understand it, is that their contract was an oral contract. If so, it was, as we have already suggested, the province of the trier of fact to ascertain its terms, and the legal effect of the contract was a matter for determination by the court. *Brannock v. Elmore,* 114 Mo. 55, 63–64, 21 S.W. 451, 453–54 (1893); *Stagner v. Staples,* 427 S.W.2d 763, 766 (Mo.App.1968).

The record indicates that the plaintiffs began work about August 6, 1986. By August 20, the plaintiffs considered their work to be 70 percent complete. They requested a progress payment in the amount of $14,000, less 10 percent retainage. However, after the plaintiffs had worked about 20 days a decision was made to lower the building pad. Plaintiffs demanded extra compensation. An attempt was made to compromise plaintiffs' claim for extra compensation, but the negotiation failed. On September 5, plaintiffs moved their equipment from the construction site.

Upon trial, the plaintiffs asserted they were entitled to recover $29,327.50 if the trial court found for them on Count I of their petition and $26,872.50 if the court found for them on Count III, in which they sought recovery in quantum meruit. The defendants asserted they had been obliged to employ other excavators to finish plaintiffs' work at a cost of $11,346.25, and sought to recover that amount (and other sums) by way of counterclaim.

[redacted] As we have indicated, the terms and legal effect of the contract were matters, in this case, for the trial court. The record strongly suggests and the trial court could have found that the plaintiffs contracted to move 10,000 cubic yards of dirt at $2 per cubic yard, and defendant agreed to pay them $20,000 to do so. The trial court could further have found that after plaintiffs' work was 70 percent complete, it became apparent that extra or additional work would be necessary because the defendant had not marked the boundary and elevation of the building site correctly. As we have noted, the plaintiffs could properly have regarded this as a breach of contract. Stating the law generally and broadly, plaintiffs then had an election to pursue at least three remedies. They were entitled to treat the contract as rescinded and could recover as far as they had performed; or, they might have kept the contract alive, for the benefit of both parties, being at all times ready and able to perform; or they could have treated the repudiation as putting an end to the contract for all purposes

of performance, suing for the profits they would have realized if they had not been prevented from performing. See, e.g., *McConnell v. Corona City Water Co.*, 149 Cal. 60, 85 P. 929, 930 (1906).

Here, the plaintiffs were entitled to treat the contract as rescinded and to seek recovery upon quantum meruit so far as they had performed. The plaintiffs' statement or invoice of August 20, 1986, represented 70 percent of the work done. The correctness of this request for payment had been agreed to by the prime contractor and the architect, and of course after completion of the contract, there was no reason to deduct the retent. However, plaintiffs' statement for extra work could have been found to be inaccurate. The amount of damages they proved to the satisfaction of the court was $14,000, as shown by their initial request for payment. It was not error to allow recovery by the plaintiffs in the amount of $14,000, even if the trial court indicated it was denying recovery in quantum meruit. As we have seen, this was a court-tried case, and the judgment will not be disturbed because the trial court gave a wrong or insufficient reason therefor.

We find no error materially affecting the merits of the action; accordingly, the judgment is affirmed.

FLANIGAN, P.J., and MAUS, J., concur.