**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CURTIS BAY COMPANY,
Plaintiff-Appellee,

v.                                                        No. 95-1278

MAPCO COAL INCORPORATED,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black, Jr., Senior District Judge.
(CA-93-2662-B)

Argued: July 10, 1996

Decided: August 21, 1996

Before WILKINS and LUTTIG, Circuit Judges, and G. ROSS
ANDERSON, JR., United States District Judge for
the District of South Carolina, sitting by designation.

_____

Vacated and remanded by unpublished per curium opinion.

_____

**COUNSEL**

**ARGUED:** Leonard Joseph Marsico, BUCHANAN INGERSOLL
PROFESSIONAL CORPORATION, Pittsburgh, Pennsylvania, for
Appellant. Edwin J. Strassburger, STRASSBURGER, MCKENNA,
GUTNICK & POTTER, Pittsburgh, Pennsylvania, for Appellee. **ON
BRIEF:** Christine J. Wichers, BUCHANAN INGERSOLL PROFES-
SIONAL CORPORATION, Pittsburgh, Pennsylvania; Lee H.

Ogburn, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for
Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In September 1993, Curtis Bay Company (CBC) sued MAPCO
Coal Inc., in federal district court in Maryland to recover tonnage fees
allegedly owed pursuant to a Coal Transshipment Agreement entered
into between the parties. In September of 1994, both parties moved
for summary judgment. On January 9, 1995, the trial judge granted
CBC's motion and denied MAPCO's. MAPCO has appealed that
decision.

On July 1, 1983, MAPCO and CBC entered into a Coal Transship-
ment Agreement. The agreement had a provided term of ten years
from July 1, 1983 to June 30, 1993. With certain provisions, MAPCO
was to pay CBC to ship a minimum number of tons of coal through
CBC's coal loading pier in Baltimore, Maryland. Also, the agreement
provided that MAPCO would pay an amount of liquidated damages
for any "deficit tonnage."

A central provision in the agreement was § 5.4. This section reads:

> Either party shall have the right to reopen negotiations on
> the fees hereunder or any other terms or conditions of this
> Agreement by giving written notice to the other party on or
> before March 1, 1988. In the event negotiations are so
> reopened and the parties reach agreement, evidenced in
> writing signed by both parties prior to July 1, 1988, then this
> Agreement shall continue under the terms and conditions
> herein as then amended and/or supplemented. In the event

2

the parties are unable to reach agreement evidenced in writing, signed by both parties prior to July 1, 1988, then this Agreement shall terminate effective on December 31, 1988.

Subsequently, the Coal Transshipment Agreement was amended in 1983, 1984, 1985, 1986 and 1987. Each of these amendments contained the following provision:

> Except as hereby supplemented and heretofore amended, the referenced Agreement shall remain in full force and effect according to its original terms and conditions.

In a letter dated February 29, 1988, MAPCO informed CBC's President, Charles Gilmore, that it was reopening negotiations under § 5.4. At that point, CBC's representative, Mr. Gilmore, and Kevin Larkin, on behalf of MAPCO, began to discuss price relief for the two year period between 1988 and 1990. Gilmore submitted a proposal to MAPCO in a June 20, 1988 letter without mentioning what would happen in 1990 should the parties not be able to agree on price. The letter also failed to address whether a § 5.4 re-opener provision would extend into 1990.

In 1988, the parties did not specifically discuss the future status of the agreement in 1990 but did resolve to "talk about prices" at that time. CBC argues that this failure indicates that it was clear that if the parties could not reach a subsequent agreement in 1990 the original terms of the Coal Transshipment Agreement would apply and control once again. MAPCO, on the other hand, contends that their desire to enter into a two year agreement shows that they did not desire or anticipate a commitment beyond 1990.

CBC submitted a signed 1988 Supplement for MAPCO to execute. That supplement contained the following provisions:

> 1. This Supplement shall be effective as of July 1, 1988, and shall automatically terminate effective at the close of business on June 30, 1990.

> 5. Except as hereby supplemented and heretofore amended, the referenced Agreement shall remain in full

3

force and effect according to its original terms and conditions.

MAPCO signed the 1988 Supplement and returned it to CBC with a cover letter from Larkin on August 23, 1988. That letter (referred to as the "Larkin Letter") contained the following language:

> Although not stated in this Amendment, it is understood that the parties agree to renegotiate new transloading rates and terms, prior to June 30, 1990. Based on this understanding, MAPCO Coal Inc. has executed this Amendment.

President Gilmore of CBC did not reply to the "Larkin Letter" because he thought the parties' decision to "talk about prices" did not include an extension of the § 5.4 re-opener provision to 1990 or allow for a termination if the parties could not reach an agreement. MAPCO, on the other hand, claims to have understood the letter to provide only for a two year contract. And, without reaching a new agreement during 1990, the contractual obligations would end December 31, 1990. MAPCO asserts that there is no evidence to support CBC's claim that the contract would continue under the original terms after the 1988 Supplement expired in 1990.

In 1990, Larkin sent Gilmore a letter notifying him that MAPCO was reopening negotiations pursuant to § 5.4. Gilmore did not believe that § 5.4 was applicable and further disagreed with Larkin's interpretation of the 1988 Supplement. Nonetheless, Gilmore decided to enter into negotiations without notifying Larkin of his disagreement. Likewise, when Gilmore sent a proposed 1990 Amendment on June 22, 1990, Larkin did not respond or indicate that the contract was scheduled to terminate if no agreement was reached by July 1, 1990.

Subsequently, MAPCO made a counter offer to which CBC replied. Such negotiations continued well into July and at no time did Larkin inform Gilmore of his position that the absence of an agreement would terminate the Coal Transshipment Agreement on December 31, 1990.

During August of 1990, Larkin and Gilmore tentatively agreed on terms for a price supplement covering the last three years of the origi-

4

nal agreement, 1990 to 1993. The next step was for Larkin to obtain permission to finalize the agreement. However, on December 27, 1990, Larkin informed Gilmore that the agreement would expire automatically on December 31, 1990 because the parties failed to reach a modifying agreement prior to July 1, 1990.

MAPCO did not ship the required amount of coal through CBC during 1991-1993. Thereafter, CBC filed suit on the contract on September 13, 1993. In an oral order January 6, 1995, the district court granted CBC's motion for summary judgment and denied MAPCO Coal Inc.'s motion for summary judgment. This Court's standard of review of the lower court's summary judgment decision is de novo. Stuart Circle Hosp. Corp. v. Aetna Health Management , 995 F.2d 500, 501 (4th Cir.), cert. denied, 114 S.Ct. 579 (1993).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). Therefore, this Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

However, summary judgment is not appropriate unless no reasonable jury could return a verdict in favor of the non-moving party while viewing all possible inferences in a light most favorable to the non-moving party. Helm v. Western Maryland Railway Co., 838 F.2d 729, 734 (4th Cir. 1988). Thus, once the moving party makes a prima facie showing that there is no genuine issue as to any material fact, the burden is on the non-moving party to show that a genuine issue exists. However, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 586 (1986).

In this case, the lower court granted summary judgment to CBC and denied MAPCO's motion for summary judgment. The district court found that MAPCO wrongfully terminated the Coal Transship-

5

ment Agreement as amended in 1988. In addition, the lower court held that the contract language clearly provided for the continuance of the agreement even in the absence of a new agreement. This Court vacates the lower courts decision and remands the case for trial.

Maryland law, which applies in this case, follows the objective law of contracts. Faw, Casson & Co. v. Everngam, 94 Md.App. 129, 134, 616 A.2d 426, 429 (1992). Courts have interpreted Maryland law to provide:

> A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean.
>
> General Motors Acceptance Corp. v. Daniels, 303 Md. 254, 261, 492 A.2d 1306 (1985).

Therefore, "the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." Slice v. Carozza, 215 Md. 357, 137 A.2d 687 (1958).

The interpretation of a written contract "is ordinarily considered to be an issue of law for resolution by the trial judge." Everngam, 94 Md.App. at 135. Quoting Board of Educ. v. Plymouth Rubber Co., 82 Md.App. 9, 26, 569 A.2d 1288, cert. denied, 320 Md. 505, 578, 578 A.2d 778 (1990). However, "when there is a bona fide ambiguity in the contract's language or legitimate doubt as to its application under the circumstances . . . the contract [is] submitted to the trier of fact

6

for interpretation." Id. Ambiguity exists if the "language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." Id.

Therefore, "where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed." Kasten Construction Company, Inc. v. Rod Enterprises, Inc., 268 Md. 318, 328, 301 A.2d 12, 18 (1973). However, where the contract language is ambiguous, extrinsic evidence may be used to determine the intention of the parties. Id. at 329.

The underlying lawsuit stems from the following language in the "Larkin Letter":

> Although not stated in this Amendment, it is understood that the parties agree to renegotiate new transloading rates and terms, prior to June 30, 1990.

In essence, the underlying suit revolves around what the term "renegotiate" means. CBC contends that this language merely required the parties to discuss new prices and allowed for the original contract terms to apply in the event no subsequent agreement was reached. However, MAPCO argues that this language carries the connotation that the contract would terminate as of July 1, 1990 if the parties were unable to reach a new agreement through negotiation.

The district judge interpreted this language to be unambiguous and found that the parties reached an agreement only to negotiate rates and terms and did not agree that the failure to reach an agreement would terminate the original contract. However, the language is not so lucid when examined from the point of view of a "reasonable person in the position of the parties." While this Court recognizes that extrinsic evidence may not be considered to determine whether the language of the "Larkin Letter" is ambiguous, the extrinsic circumstances need to be considered to ascertain the respective "position of the parties."

The positions of CBC and MAPCO are in contrast. A party in CBC's position would believe that the "Larkin Letter" merely

7

required the parties to "talk about prices" in 1990. Since nothing was said during negotiations or in the letter about the adoption of a § 5.4 style renegotiation resulting in a termination of the contract if a new agreement was not struck, a reasonable person in CBC's position could have thought that the "Larkin Letter" simply required the parties to discuss new terms. As such, a party similarly situated could have concluded the language of the contract meant that the original terms would again control in 1990 if no new agreement was reached.

However, a party in the position of MAPCO could have interpreted the language in a different manner. First of all, a party just concluding a § 5.4 renegotiation calling for termination of the contract if no accord was reached could believe that any further "renegotiation" would be on the same terms as the present concluded negotiation. That is, the contract would terminate if no new agreement was reached. In addition, a party that specifically entered into a two year supplemental agreement with the understanding to renegotiate in two years could believe that the term of the original contract was no longer applicable and the parties would need to reach a new agreement in 1990 in order to continue a contractual relationship.

Therefore, in examining the language of the "Larkin Letter" from the view of a reasonable person in the position of the parties, it becomes apparent that the language, specifically the word "renegotiate," was ambiguous.

This Court acknowledges that a term such as "renegotiate" is facially unambiguous. However, reasonable persons in the position of the parties could have placed altogether different meanings on the term. Therefore, this Court finds that the "Larkin Letter" language was ambiguous and was "not susceptible of a clear and definite understanding." Thus, we find that the district judge erred in his conclusion that the terms of the letter were unambiguous.

With this determination that the contract language was ambiguous, it is necessary that the contract be submitted to a trier of fact for interpretation. Everngam, 94 Md.App. at 135. As admitted by the Appellee in its Brief, if the language of the contract is determined to be ambiguous, "the extrinsic evidence of the parties' intent is sufficiently

conflicting to preclude the granting of summary judgment based on intent in favor of either party." CBC's Brief p. 29. This Court agrees.

Accordingly, we vacate the summary judgment and remand the case for further proceedings.

VACATED AND REMANDED

9