James A. SCHELL, II, M.D., F.A.C.P., Appellant,

v.

LIFEMARK HOSPITALS OF MISSOURI, Respondent.

No. WD 59826.

Missouri Court of Appeals, Western District.

Oct. 31, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Dec. 24, 2002.

Application for Transfer Denied Jan. 28, 2003.

Danieal H. Miller, Columbia, MO, for Appellant.

Terrance J. Good, St. Louis, MO, for Respondent.

Before LOWENSTEIN, P.J., NEWTON and HOLLIGER, JJ.

HAROLD L. LOWENSTEIN, Judge.

Dr. James A. Schell appeals the trial court's judgment, in a bench-tried case, in favor of respondent Life Mark. Schell had filed a breach of contract suit against Life-Mark for not paying him severance pay he claimed was owed him under a four-year employment contract between the two. Because LifeMark terminated Schell without cause and because LifeMark had a contractual obligation to pay severance pay if it terminated Schell without cause, this court reverses the trial court's judgment.

### Factual & Procedural History

On July 1, 1993, Dr. Schell and Life-Mark entered into an employment contract according to which Schell would provide medical services to patients provided by LifeMark, and LifeMark would take over Schell's practice. As compensation, Schell would receive a base salary of $93,750 per year and incentive compensation equal to fifty percent of receipts from medical services when those services exceeded $75,000 per year. Because Schell's pay was dependent on the payer mix—that is, the relative percentage of fee-for-service providers versus providers who solely pay a flat fee for patient care the two parties agreed that "in the event of a change in payor [sic] mix" they would "renegotiate" the incentive pay provision. "Failure to renegotiate same within 30 days of the annual anniversary of th[e] [a]greement [e.g., July 1, 1996] shall constitute a termination without cause."

Section G of the contract, titled "Termination Without Cause," allowed LifeMark to terminate the agreement without cause so long as it provided Schell 30 days written notice. It also stated: "In that event, [LifeMark] agrees to make severance payments to [Schell] in the amount of 6 months compensation plus one additional month for every three months of full-time employment starting from July 1, 1993; however, total severance shall not exceed 18 months compensation." In addition, § G required LifeMark to notify Schell in writing if it did not intend to renew the employment agreement; failing to notify would be a termination without cause.

The contract commenced on July 1, 1993, and was slated to continue for four years thereafter, "unless sooner terminated in accordance" with the employment contract.

During the last six months of 1995, Life-Mark proposed increasing the number of managed care plan in which it participated, starting January 1, 1996. In December, 1995, Schell took a two week vacation in addition to taking off the regular holidays, thus resulting in a $16,550 drop in his income for that month. On May 1, 1996, Life Mark [1] notified Schell that it did not

---

1. Unless indicated otherwise, all communication between LifeMark and Schell was via letters. Because the names of LifeMark's

intend to renew his employment contract at the end of its term, July 30, 1997, referring to § G. LifeMark expressed a willingness to enter into a new contract with Schell.

On July 1, 1996, an anniversary date, Schell notified LifeMark that he felt he had experienced a substantial and continuing change in payer mix since June 30, 1993, necessitating renegotiation of his incentive pay compensation. In a table, Schell juxtaposed the payer mix for the January 1, 1996—June 30 period with that for the July 1, 1992—June 30, 1996 period. It purported to show a drop in fee-for-service ("commercial") providers, from 27.2 to 15.2 percent of total receipts, with an increase from zero to 9.1 percent of HMO providers. Schell proposed a new compensation package, to wit: base pay of $93, 750; supplemental pay of $85,000 for services as a Medical Director/Technical Supervisor to compensate for "negative effects of administrative policies"; and incentive pay in the amount of 30 percent of booked charges in excess of $76,500 per year. Schell also floated the idea of relative value units (RVUs) as a better basis for incentive pay.

In response, on July 16, 1996, LifeMark expressed willingness to review the relevant data and to enter into a new employment contract. LifeMark proposed that any new compensation provision would start on June 1, 1997—one month before the natural termination of the original agreement. It rejected basing incentive pay on booked charges because they would conflict with a contract it had with a third party, Telnet; stated that it did not believe supplemental pay of $85,000 for a medical directorship was acceptable because incentive pay must directly represent performance; and denied that any change in payer mix of less than twelve percent was

significant, since seventy percent of Schell's business, represented by Medicare and Medicaid payers, remained unchanged.

Schell responded on July 19, 1996, stating that he did not understand why any new incentive pay provision would not apply to the new contract period. Schell stated that he did not see why the acceptability of booked charges should turn on whether Telnet gave a thumbs up, since his contract was with LifeMark. Nonetheless, Schell proposed basing incentive pay on RVUs. Schell pointed out that another doctor who provided services similar to those he (Schell) provided had received $90,000 per year from LifeMark as a medical director.

On August 5, 1996, LifeMark and Schell met to discuss their correspondence. During the meeting, the parties discussed payer mix, incentive compensation, using RVUs as basis for compensation, and a medical directorship. According to LifeMark's testimony, Schell said that, unless he received a medical directorship and $220,000 a year, he would not renew the agreement. LifeMark informed Schell that there was no medical directorship available and proposed dividing incentive pay into a managed-care portion and a fee-for-service portion.

Six days later, Schell sent LifeMark a draft of incentive pay based on RVUs. He told LifeMark that the divided incentive pay was a nonstarter. On September 1, 1996, Schell notified LifeMark that he was terminating their contract because LifeMark had not renegotiated the incentive pay compensation provision by July 31, 1996. Accordingly, Schell said that LifeMark owed him $199,284.28 in severance pay. Because LifeMark had rejected the

agents are immaterial to this case, LifeMark's    agents are referred to as "LifeMark."

two proposals Schell submitted for consideration, Schell said he thought any further discussion would be unproductive.

Schell filed a petition for breach-of-contract damages, specifically seeking severance pay of $199,248.02. After a bench trial, the trial court found that: (1) both parties violated the covenant of good faith and fair dealing in their renegotiation of the incentive pay provision; (2) Schell's contract had not been terminated without cause; and (3) Schell was not entitled to severance pay. The trial court traced Schell's bad faith to the fact that his proposed modifications would have boosted his income to level higher than what it was before there was a change in the payer mix. LifeMark acted in bad faith, according to the trial court, because LifeMark did not do any research or computations regarding the effect the change in payer mix had on Schell's income before concluding the change was insignificant.

## Standard of Review

■ Appellate review of a bench is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Reversal is warranted only where the judgment is against the weight of the evidence or is unsupported by substantial evidence, or where the trial court misstates or misapplies the law. *Id.*

## Analysis

### A. Renegotiation Term

■ The first issue is whether LifeMark agreed to pay Schell severance pay if the negotiations between the two over Schell's incentive pay floundered. LifeMark and Schell agreed to renegotiate the incentive pay provision within 30 days of the anniversary date if the payer mix changed. While they agree that the payer mix changed, LifeMark first contended the change was insubstantial—though its CEO later testified that an eleven percent shift was substantial. Because their agreement did not require a substantial change only *some, non-de minimis* change [2]—the point is moot, making resolution of the meaning of "renegotiate" mandatory.

■ The trial court found the contract unambiguous—interpreting the renegotiation clause as requiring the parties to agree to a new incentive pay term that would stabilize Schell's incentive compensation—but this finding was erroneous because there were two levels of ambiguity in the renegotiation clause. The goal of contract interpretation is to ascertain and give effect to the intent of the contracting parties. *Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. banc 1995). The first level of ambiguity has to deal with the word "renegotiate," which is unclear because it has two reasonable meanings.[3] *See Eisenberg v. Redd*, 38 S.W.3d 409, 411

2. Requiring renegotiation where the change was *de minimis* would be inefficient because the costs of negotiation itself would swamp any benefits Schell might reap from a successful renegotiation. An eleven percent drop in payer mix is not, however, *de minimis*—at least not under the facts of this case.

3. The Fourth Circuit has handled a case similar to the one *sub judice* in *Curtis Bay Co. v. Mapco Coal, Inc.*, 95 F.3d 41 (Table), 1996 WL 472421 (1996), where two companies, CBC and Mapco, had agreed "to renegotiate new transloading [*sic*] rates and terms, prior

to June 30, 1996." *Id.* at *4. CBC contended that the agreement only required discussion about prices, whereas Mapco insisted that the contract would terminate should the two be unable to agree to new rates and terms. *Id.* The court, though describing "renegotiate" as facially unambiguous, nonetheless held that "reasonable persons in the position of the parties could have placed altogether different meanings on the term." *Id.* at *5. In Missouri, this is the same as saying the term is ambiguous. *See Eisenberg, infra.*

(Mo.2001) (term in contract ambiguous where it has two or more reasonable meanings). It can mean either (1) to negotiate anew, with no guarantee of success, or (2) to revise the terms of a contract through negotiation. *See* The American Heritage Dictionary of the English Language (4th ed.2000).[4]

Here, the context clarifies which meaning the parties intended. *See Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 480 (Mo.App.2002) (where term susceptible to multiple interpretations, term should be construed in light of context). First, it must be noted that this contract was the product of the sale of Schell's practice to LifeMark in exchange for employment— apparently a means to reduce the risk to Schell of a possible downturn in his practice. Hence, the base pay was an income floor for Schell. The incentive pay was a way to ensure productivity on the part of Schell. If "renegotiate" only meant "discuss in good faith without necessarily reaching agreement," it would be possible for Schell's income to plummet to base pay alone. If the term required agreement, on the other hand, then Schell would get severance pay should such an event come to pass. It is unlikely that Schell would sell his practice for the right to receive a reduced, but guaranteed, wage scale for four years and much more likely that he bargained for severance pay if the two could not find a way to ratchet up his income in the event of a change in payer mix. Further bolstering this interpretation is the fact that the contract anticipated that Schell would work for LifeMark for four years. It stands to reason that any renegotiation regarding the incentive pay, which theoretically could be necessary once a year, would have to be successful. Otherwise, on every subsequent anniversary date the parties would have to renegotiate the same change in payer mix, which may have happened two or three years previously, since the change is in reference to the original incentive pay provision when the parties entered the contract. When Schell started working for LifeMark, his annual salary was anticipated to be $93,750 base pay combined with $37,500, at a minimum, from incentive pay. That is, at minimum twenty-nine percent of his total pay would stem from incentive compensation. The renegotiation clause was designed to protect him from a potential twenty-nine percent precipitous drop in his income that could result because of something beyond his control.

The contract requires the parties to "renegotiate" within 30 days of the annual anniversary." If "renegotiate" only meant discuss in good faith, LifeMark could very well meet with Schell one day before the expiration of the thirty day period, with the honest desire to hammer out an agreement. If no agreement were forthcoming, LifeMark would not be in breach. This would border on the absurd. It is much more likely that failure to reach a *modus vivendi* would obligate LifeMark to pay severance pay, especially considering that Schell had sold LifeMark his practice in exchange for a four-year employment contract.

---

**4.** For cases where the second meaning is used by the courts, *see In re 80 Nassau Assocs.*, 169 B.R. 832, 843 (Bankr.S.D.N.Y.1994) ("Meaningful negotiations" is ambiguous to the point of being meaningless, and Crossland never promised that it would actually renegotiate the terms of the Agreement, or extend the due date of its past due mortgage. Nevertheless, the pleading can be read to allege that Crossland made a clear and unambiguous promise to negotiate in good faith.") & *Delgado v. Ferguson*, 66 Mich.App. 135, 238 N.W.2d 424, 424 (1976) (change in rent term in lease "must necessarily be considered to be a 'renegotiation' under the plain and popular meaning of the term").

■ The second level of ambiguity in the renegotiation clause is the phrase, "within 30 days." LifeMark and Schell must successfully renegotiate the incentive pay provision within 30 days of the anniversary date—here, July 1, 1996. There are three ways to read the 30–day requirement: as requiring agreement (1) by or sometime 30 days before July 1, 1996; (2) either sometime 30 days before or 30 days after July 1, 1996; or (3) sometime within the 30 days after July 1, 1996.(1) is improbable because if that meaning were intended it could much simply be expressed by using "by July 1, 1996." (2) is a possible, though overly technical reading and hence unlikely, construction of the phrase. This leaves (3), which Schell favors. This court agrees that it was the most probable meaning.

■ A sub-issue remains—whether an agreement to successfully renegotiate on unspecified terms is a mere "agreement to agree," the mere concatenation of mutual illusory promises. An illusory promise is a promise to engage in behavior of an indefinite sort. Corbin on Contracts § 5.28. Because of the indefiniteness of the promised contractual undertaking, there is no way to (1) ascertain whether the parties have complied or (2) reasonably fix damages. Here, two things undermine the argument that the renegotiation clause is an illusory promise. First, the trend is against refusing to enforce promises on the grounds of indefiniteness. *Id.* Second, and more importantly, the reasons for refusing to enforce are not applicable. Whether the parties have reached an agreement on the incentive pay provision is a yes-or-no question. They did not. Fixing damages is also not a problem: The contract stipulates that failure to renegotiate, as termination without cause, kicks in the severance pay provision, which provides a definite formula for figuring out payments.

For the foregoing reasons, this court holds that the renegotiation clause required LifeMark and Schell to successfully renegotiate the incentive pay provision by the end of 30 days after the anniversary date in the event of a change in the payer mix.

### B. *Good Faith*

■ While LifeMark had a contractual obligation to modify the incentive pay provision when the payer mix changed, bad faith on the part of Schell would relieve LifeMark of liability for failure to renegotiate the incentive pay provision because without a good faith attempt by Schell to deal with LifeMark any negotiation by LifeMark would be futile. In short, good faith negotiation by Schell was an implied-in-law condition precedent to LifeMark's obligation to renegotiate the incentive pay clause. *See Deutsch v. Boatmen's Nat. Bank of St. Louis,* 991 S.W.2d 206, 208 (Mo.App.1999) (performance of conditions precedent is an essential element of a claim for breach of contract). (Otherwise, Schell could get severance pay by engaging in surface bargaining or no bargaining at all.) Moreover, because renegotiation, however construed, requires negotiation and because the covenant of good faith and fair dealing, implied in every contract, requires that performance and enforcement terms be carried out in good faith, *Farmers' Elec. Co-op., Inc. v. Missouri Dep't of Corrs.,* 977 S.W.2d 266, 271 (Mo. banc 1998),[5] Schell had an obli-

---

**5.** There is no carve-out for employment contracts. *See McKnight v. Midwest Eye Institute of Kansas City, Inc.,* 799 S.W.2d 909, 914 (Mo.App.1990) (employer breached duty of good faith by terminating ophthalmologist's on-call duties, canceling his surgeries, and locking his office one month before the expiration of the employment contract); *Ley v. St.*

gation to negotiate in good faith. The good faith obligation requires that contracting parties not prevent or hinder performance by the other party. *Robinson v. Powers*, 777 S.W.2d 675, 681 (Mo.App. 1989). The party claiming breach of the implied covenant of good faith must present substantial evidence that it has been violated. *Environmental Prot., Inspection, & Consulting, Inc. v. City of Kansas City*, 37 S.W.3d 360, 366 (Mo.App.2001). The question is, Did Schell breach his good-faith duty? He did not. The trial court's finding to the contrary was against the weight of the evidence.

■■■■■ There is much confusion surrounding the covenant of good faith. It is not a general reasonableness requirement.[6] *See Rigby Corp. v. Boatmen's Bank and Trust Co.*, 713 S.W.2d 517, 526 (Mo.App. 1986) (holding that defendant was in "good faith" when he acted on what he believed he knows, whether or not what he believed was true or reasonable to believe). *See also U.S. v. Basin Elec. Power Co-op.*, 248 F.3d 781, 796 (8th Cir.2001); *Original Great Am. Chocolate Chip Cookie Co. v. River Valley*, 970 F.2d 273, 280 (7th Cir.) (Posner, J.) ("There is no blanket duty of good faith; nor is reasonableness the test of good faith."). It is not "an overflowing cornucopia of wished-for legal duties," *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir.1996), only an obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the time of contracting. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990). Because the duty of good faith, "even expansively conceived," is not one of candor, *Market St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594 (7th Cir.1991) (Posner, J.), hard bargaining is not *per se* bad faith.[7] Though phrased in moralistic overtones, good faith does not import into contract law the negligence principles of tort law. *See Missouri Consol. Health Care Plan v. Community Health Plan*, 81 S.W.3d 34, 47–48 (Mo. App.2002) (defendant did not breach duty of good faith and fair dealing because no evidence defendant attempted to evade the "spirit of the contract"). *See also Carriage Hill Health Care, Inc. v. Hayden*, 1997 WL 833131, at *2 (D.N.H.1997) ("[T]he legally enforceable covenant itself is not as broad as [some] formulations [of good faith] would suggest. Not all unethical conduct is unlawful, as legally enforceable obligations remain a narrower subset of the broader concept of ethical obligations. The implied covenant of good faith and fair dealing does not prohibit all unethical conduct.") (commenting on Justice Souter's classic exposition of the common law duty of good faith, *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187 (1989)). Why not? In Missouri, the goal of contract law is to flesh out the

---

*Louis County*, 809 S.W.2d 734, 737 (Mo.App. 1991) (police officer failed to establish violation of good faith duty in his employment contract because of insufficiency of evidence).

6. This is not to deny the existence of the tort of bad faith. *See State Farm Fire & Cas. Co. v. Metcalf, by Wade*, 861 S.W.2d 751, 756 (Mo.App. S.D.1993). Negligence is not, however, an element of the tort. *Id.* In fact, the tort specifically distinguishes good faith from negligence; the fourth element of the tort requires proof that "the insurer act[ed] in bad faith, rather than negligently."

7. "In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith." *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1223 (7th Cir.1988).

intent of the parties, *see infra.* Insofar as good faith is read broadly to require reasonableness, it might displace the parties' actual agreement.

■ Reasonableness does play a role in the good faith analysis—but only as evidence of subjective intent to undermine fulfillment of the contract.[8] Had Schell, for instance, demanded a blatantly unreasonable sum as incentive pay compensation, say, $10 million per year, the unreasonableness of the demand would be strong, perhaps even dispositive, evidence of the want of good faith. While good faith is not the same as reasonableness, it does require behavior on behalf of the parties that comports with the "reasonable expectations of the parties" but *only* in light of their *purposes* in contracting. *See Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187, 193 (1989) (Souter, J.) ("[U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, *consistent with the parties' purpose or purposes in contracting.*") (emphasis added).

Taking these observations in mind, this court is bound to reverse the trial court's finding that Schell was in bad faith because his proposed changes in the formula for computing his incentive pay, if accepted, would have resulted in a salary boost over what he was making before the change in payer mix. The trial court misread the doctrine of good faith. That Schell was attempting to improve his economic position by asking for a raise, as it were, does not necessarily mean he was in bad faith. On the contrary: Schell's conduct indicated a commitment to renegotiating the incentive pay provision. He made the first overture, recommending a medical director stipend in lieu of the prior compensation provision—though the contract nowhere explicitly obliges him to notify LifeMark of the change in payer mix. He proposed basing incentive compensation on booked charges, which was rejected. He then proposed using RVUs as a substitute—even after the July 31st deadline had passed.

Respondent contends that Schell's taking significant time off in December, which Schell admits caused a decline in income, indicates bad faith. The point is not germane. The question is not whether Schell breached his contract with LifeMark by taking excessive time off—LifeMark did not counterclaim—but rather whether Schell's behavior *during negotiations* was

---

**8.** It must be noted that the default rule under the U.C.C. is that "good faith" means "honesty in fact," whether reasonable or not. *Consol. Public Water Supply Dist. No. C–1 v. Farmers Bank*, 686 S.W.2d 844, 851 (Mo.App. 1985). However, good faith under the U.C.C. requires merchants to exercise both "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 400.2–103(1)(b) RSMo (2000). Art. 2 of the U.C.C. is not applicable, however, except perhaps by analogy, to a contract involving services alone. This court refuses to upend precedent by applying the reasonableness requirement here. Even assuming, *arguendo*, that good faith required reasonableness this court sees nothing unreasonable in Schell's behavior. He initiated negotiations; he made numerous proposals and, when rebuffed by LifeMark, made counterproposals. He negotiated even beyond the modification deadline, though not obligated to do so. Schell's demand for $220,000 was, at worst, an instance of hard bargaining, which, given the prolonged nature of the negotiations, was understandable. At a minimum, the demand was not relevant to the good faith issue because the demand was made beyond the modification deadline.

in bad faith. To be sure, the time taken off may have reduced his income, but Life-Mark's obligation to change the incentive compensation provision was not contingent upon the amount of vacation time taken by Schell. Even if Schell's vacation time were relevant to the good faith analysis—perhaps, as indicating a state of mind antithetical to reaching agreement—Schell's behavior during the negotiations swamps any inference created by his pre-negotiation behavior.

LifeMark argues that Schell's so-called termination letter of September 1, 1996, put Schell in breach. Because LifeMark had already terminated Schell without cause, the contract had terminated, thus making Schell's purported termination letter nugatory.

Because Schell engaged in good-faith negotiation, LifeMark was not relieved of its obligation to reach agreement with Schell. By not doing so by the end of July 31, 1996, LifeMark, per the terms of the contract, terminated Schell without cause and thus owed Schell severance pay, according to the formula set out in the contract. The trial court's conclusion to the contrary was against the weight of the evidence.

The trial court's judgment is reversed, and the case is remanded for the trial court to enter judgment in favor of Schell and to compute damages in accordance with § G of the contract's additional provisions.

All concur.