# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 00-1946NI, 00-2045NI
_____

| | |
|---|---|
| _____ | * |
| | * |
| No. 00-1946NI | * |
| | * |
| _____ | * |
| | * |
| Dan Abels; Les A. Beekman; Steven | * |
| Berschman; Ronald Berschman; Daryl | * |
| Cushman; David Farms, Inc., an Iowa | * |
| Corporation; Duane Davids; Dale | * |
| Kramersmeier; Diana Kramersmeier; | * |
| D&D Kramersmeier, LTD, an Iowa | * |
| Corporation; M&J Ennen Farms, Inc.; | * |
| Ronny Ennen; Rande Giesking; and | * |
| Hamilton Land Corporation, | * On Appeal from the United |
| | * States District Court |
| Plaintiffs - Appellants, | * for the Northern District |
| | * of Iowa. |
| Bruce A. Heetland and Heidecker | * |
| Farms, Inc., | * |
| | * |
| Plaintiffs, | * |
| | * |
| James Hofbauer and Rick Hofbauer, | * |
| | * |
| Plaintiffs - Appellants, | * |
| | * |
| Junkermeier Farms, Inc., | * |
| | * |
| Plaintiff, | * |
| | * |

Bruce Meinders, Dale L. Meinders, &ast;
and Gary Meinders, doing business as &ast;
Meinders Brothers; Clarence Miller and &ast;
Christian Miller, doing business as &ast;
C&C Miller Farmers; J&K Oftedahl, &ast;
Inc., an Iowa Corporation; Pitkin Farms, &ast;
LTD;  Jeff Pitkin; Sandale Farms, Inc.; &ast;
Ronald L. Schmidt; Debra Schmidt; &ast;
Steve Shortenhaus; Shawn Thomsen; &ast;
Bill Walstead; Joyce Walstead; and &ast;
SJMC Corp., an Iowa Corporation, &ast;
&ast;
   Plaintiffs - Appellants, &ast;
&ast;
  v. &ast;
&ast;
Farmers Commodities Corporation, &ast; On Appeal from the United
an Iowa Corporation, and FCC &ast; States District Court
Futures, Inc., an Iowa Corporation, &ast; for the Northern District
&ast; of Iowa.
   Defendants - Appellees. &ast;
   _____ &ast;
&ast;
   No. 00-2045NI &ast;
   _____ &ast;
&ast;
Dan Abels; Les A. Beekman; Steven &ast;
Berschman; Ronald Berschman; Daryl &ast;
Cushman; David Farms, Inc., an Iowa &ast;
Corporation; Duane Davids; Dale &ast;
Kramersmeier; Diana Kramersmeier; &ast;
D&D Kramersmeier, LTD, an Iowa &ast;
Corporation; M&J Ennen Farms, Inc.; &ast;
Ronny Ennen; Rande Giesking; and &ast;
Hamilton Land Corporation, &ast;
&ast;
   Plaintiffs, &ast;

Bruce A. Heetland and Heidecker * 
Farms, Inc., *
*
        Plaintiffs - Appellants, *
*
James Hofbauer; Rick Hofbauer; *
Junkermeier Farms, Inc., Bruce *
Meinders, Dale L. Meinders, *
and Gary Meinders, doing business as *
Meinders Brothers; Clarence Miller and *
Christian Miller, doing business as *
C&C Miller Farmers; J&K Oftedahl, * On Appeal from the United
Inc., an Iowa Corporation; Pitkin Farms, * States District Court
LTD; Jeff Pitkin; Sandale Farms, Inc.; * for the Northern District
Ronald L. Schmidt; Debra Schmidt; * of Iowa.
Steve Shortenhaus; Shawn Thomsen; *
Bill Walstead; Joyce Walstead; and *
SJMC Corp., an Iowa Corporation, *
*
        Plaintiffs, *
*
     v. *
*
Farmers Commodities Corporation, *
an Iowa Corporation, and FCC *
Futures, Inc., an Iowa Corporation, *
*
        Defendants - Appellees. *

_____

Submitted: March 14, 2001
Filed: July 3, 2001

_____

Before RICHARD S. ARNOLD and FAGG, Circuit Judges, and PERRY,[1] District
    Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.


    The District Court dismissed this case for failure to state a claim. It held, first, that a plaintiff seeking to hold a principal liable for an agent's fraud must plead not only fraud but also agency with particularity pursuant to Federal Rule of Civil Procedure 9(b). In the District Court's view, the plaintiffs failed to meet that heightened standard in pleading a principal-agent relationship between the Farmers' Commodities Corporation and Henry Mayland, who is alleged to have induced many of the plaintiffs to enter into the "hedge-to-arrive" (HTA) contracts at issue here. The District Court also held that the plaintiffs lacked standing under the Commodity Exchange Act (CEA), and that they had again failed to satisfy Rule 9(b) with respect to the allegations of mail and wire fraud underlying their RICO claims. We reverse the District Court's judgment and remand the case for further proceedings.


I.


    The defendants have moved to strike certain exhibits which the plaintiffs introduce for the first time on appeal. The exhibits in question are not necessary to our analysis here, and we ignore them. We assume, as we must in reviewing a dismissal for failure to state a claim, that all factual allegations in the complaint are true. See Goss v. City of Little Rock, 90 F.3d 306, 308 (8th Cir. 1996).

_____

[1]The Hon. Catherine D. Perry, United States District Judge for the Eastern District of Missouri, sitting by designation.

The plaintiffs in this case are farmers. The defendants are a futures commission merchant, Farmers' Commodities Corporation (FCC), and its wholly-owned subsidiary and introducing broker, FCC Futures, Inc. (Futures). Not a party here, but an important actor nonetheless, is the Farmers Cooperative Elevator of Buffalo Center (the Elevator). The manager of the Elevator, Henry Mayland, was also the manager of Futures' branch office in Buffalo Center, Iowa. As manager of that office, Mayland was registered with the Commodity Futures Trading Commission as an agent of Futures and was responsible for whatever business Futures did through that office. Specifically, he had the duty to oversee all sales of commodity futures and all promotion of such sales to actual or prospective customers of Futures, and to review the content of all promotional material used by his office. Because FCC was the guarantor futures commission merchant of Futures, Mayland was required to obtain its approval of all promotional material, including seminars and presentations made to the general public. In addition, he had to implement any new procedures or compliance directives received from FCC in its role as guarantor futures commission merchant of Futures.

As early as January, 1993, Henry Mayland began soliciting farmers who did business with the Elevator to enter into HTA contracts. An HTA contract resembles a normal commodity-futures contract, in that it is an agreement to exchange a certain kind and quantity of a commodity – here, grain – at some future date, for a predetermined price. Because the purchase price is set in advance, both the buyer and the seller are exposed to the risk that the market price on the delivery date will differ, unfavorably, from the contract price. The distinctive feature of an HTA contract lies in its method of "hedging" that risk. In a typical HTA, the buyer protects itself by taking an equal and opposite position in the futures market to offset any loss it would suffer if the price it has agreed to pay turns out to be too high. The seller, for his part, has the right to "roll" the delivery date. Thus, if the parties have contracted for delivery in September, and the market price at that time turns out to be substantially higher than the price agreed upon, the farmer may find it more profitable to sell the crop on the cash market and defer delivery. This is allowed upon the payment of a certain sum in

"roll charges." The net effect of the HTA arrangement is supposed to be to protect both buyers and sellers from fluctuations in crop prices.

In order to solicit these agreements on behalf of his employers, Mr. Mayland held "marketing meetings" at which he and others made representations to farmers about the risks and advantages of HTA contracts. The complaint gives dates and locations for these meetings and tells who spoke, what representations were made, and what plaintiffs were in attendance. In essence, Mayland and his agents told the farmers that HTAs were free of risk, that they could be rolled indefinitely into the future, and that they could be used to hedge prices on a quantity up to 100% of a farmer's anticipated annual production. Some farmers were told that, using HTAs, they could sell more grain than they expected to grow and then sell their excess contracts to their neighbors; that they would have no obligation to deliver grain; and that they could buy out of the contract at any time. Mayland and his agents represented the HTA agreements to many plaintiffs as a way to put a floor under the price they would receive for their grain. That is, they said a farmer who used HTAs would not receive less than the contract price, but would leave open the possibility of receiving more (in a seller's market) by "rolling" the HTA delivery date and selling to another buyer. FCC's employee Earl Cornelius, the featured speaker at a marketing meeting attended by one plaintiff, made substantially the same representations as Mayland and his agents made.

On the basis of these representations, each of the plaintiffs began writing HTA contracts with the Elevator. The contracts were printed on a standard form and had most of their terms in common. Each recites that "the following futures transaction was made for seller on the Chicago Board of Trade." The futures transactions corresponding to the contracts were placed in the Elevator's regulated commodity account with FCC, an activity which involved communication by mail and telephone. Each time a farmer rolled a delivery date, the Elevator would alter the corresponding futures position in its FCC account (again using the mails or wires) and charge the

farmer a fee.  FCC's commissions increased with the number of transactions in the account.

The farmers brought this action mainly to recover sums that the Elevator claims they owe on their HTA contracts.  Their claim is essentially that, although represented by the defendants as a risk-free form of price protection, the HTA agreements actually exposed the farmers to a substantial risk of losing money on the futures market.  The District Court dismissed the farmers' first complaint under Federal Rule of Civil Procedure 12(b)(6), but granted them leave to replead.  They then filed an amended complaint, which the Court dismissed with prejudice.  On appeal from that judgment, the plaintiffs challenge three specific holdings of the District Court.  They argue that they have sufficiently pleaded a principal-agent relationship between Mayland and FCC, that they have standing to sue under the Commodity Exchange Act, and that their allegations of mail and wire fraud satisfy Rule 9(b), which requires that the circumstances constituting fraud be pleaded with particularity.

We find merit in all three of these arguments.  The plaintiffs have sufficiently pleaded agency, even under the standard of Rule 9(b); they have pleaded facts that, if true, confer standing to bring at least one claim under the CEA; and their complaint gives the defendants sufficient notice of the specific misconduct for which the plaintiffs seek recovery under RICO.  For these reasons, we reverse the judgment of the District Court in relevant part and remand for further proceedings.

II.

Because the decision to dismiss a complaint for failure to state a claim involves no factual findings, we owe no deference to the District Court.  Review is de novo.  We must construe the complaint so as to favor the non-moving party, here the plaintiffs, and may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proven consistent with the allegations."  Casino Resource Corp. v. Harrah's

Entertainment, Inc., 243 F.3d 435, 437 (8th Cir. 2001). The factual complexity of this case does not alter the essentially legal nature of questions concerning the sufficiency of pleadings, nor does it affect the standard of review.

The District Court's holding that the plaintiffs had failed to state a claim against FCC rested on its belief that, under Federal Rule of Civil Procedure 9(b), a plaintiff seeking to hold a principal liable for an agent's fraud must plead not only fraud but also agency with particularity. Some district courts have so held. See, e.g., Kolbeck v. LIT Am., Inc., 923 F. Supp. 557, 569 (S.D.N.Y. 1996), aff'd, 152 F.3d 918 (2d Cir. 1998) (summary order); American Credit Indem. Co. v. HCG Fin. Servs., Inc., 1990 WL 77992, *4 (N.D. Ill. June 1, 1990).[2] In fact, a complaint by these very plaintiffs against another futures commission merchant was recently dismissed on the same grounds, see Gunderson v. ADM Investor Serv., Inc., 43 F. Supp. 2d 1058 (N.D. Iowa 1999), only to be reinstated by this Court, Gunderson v. ADM Investor Serv., Inc., 230 F.3d 1363 (table), 2000 WL 1154423 (8th Cir. 2000). In Gunderson, we held that the plaintiffs had sufficiently pleaded the elements of agency under Iowa law, even under the higher standard, because they alleged that the futures commission merchant "supervised the content of [its guaranteed introducing broker's] seminars promoting HTA agreements

_____

[1]The narrower rule adopted by the Seventh Circuit in Lachmund v. ADM Investor Serv., 191 F.3d 777 (7th Cir. 1999), would not apply here. In that case, the court held that "when the plaintiff relies upon the same circumstances to establish both the alleged fraud and the agency relationship of a defendant, the reasons for more particularized pleading that animate Rule 9(b) apply with equal force to the issue of agency and to the underlying fraud claim." Id. at 783. The Lachmund plaintiffs sought to hold certain defendants liable as co-conspirators for the acts of other defendants. As the court noted, this theory "depends . . . on the substantive allegations of fraud to establish the agency relationship." Id. Here, in contrast, the plaintiffs do not allege that the agency is "part of the fraud," Kolbeck, 923 F. Supp. at 569; instead, the allegation of agency here is based on claims that one party supervised, controlled, and profited from the activities of another.

to plaintiffs, and knew or should have known that the seminars misrepresented the risks involved." 2000 WL 1154423 at *2. The complaint in this case also contains such allegations. Gunderson cannot be distinguished. The plaintiffs have sufficiently pleaded that Mayland was FCC's agent for the purpose of soliciting HTA agreements, and they should have a chance to prove that claim.

### III.

The District Court held that the plaintiffs lacked standing to sue under the Commodity Exchange Act. Standing exists under the Act if the plaintiff purchased a futures contract through the defendant and suffered at the defendant's hands some wrong for which the Act provides a remedy. 7 U.S.C. § 25(a)(1)(B). The plaintiffs here have alleged that they wrote HTA contracts with the Elevator, in which the Elevator agreed to purchase commodity futures through FCC and Futures. The futures positions are claimed to have been taken "for the farmers' risk." Amended Complaint at 7. This claim finds support in the HTA agreements themselves, in which the Buyer (the Elevator) "confirms the following futures transaction was made *for seller* today on the Chicago Board of Trade . . .." Appellants' Appendix 147 (emphasis added). The defendants point out that only the Elevator actually had its name on a commodity futures account with FCC. But if it traded on that account as an intermediary for the farmers, then the farmers (through the Elevator) purchased commodity futures through FCC and Futures and have standing to sue for those parties' alleged violations of the Act.

Despite its holding that the plaintiffs lacked standing, the District Court went on to address their claims for violations of the CEA. The plaintiffs do not appeal from the District Court's holding that the Act does not create a private right of action for excessive speculation under 7 U.S.C. § 6a. However, that holding did not affect the plaintiffs' other CEA claim, which was based on the theory that the HTA agreements were illegal off-exchange futures contracts. This claim was dismissed solely for lack

of standing. The District Court rejected the defendants' alternative challenge to the claim, correctly holding that the question whether the HTAs were futures contracts or unregulated cash-forward contracts depended on whether the parties intended the actual delivery of grain. See Grain Land Coop. v. Kar Kim Farms, Inc., 199 F.3d 983, 992 (8th Cir. 1999). Therefore, because the plaintiffs have standing to bring this claim, it should be reinstated.

## IV.

The District Court's dismissal of the plaintiffs' RICO claims was based in part upon its holding that they had not sufficiently alleged the defendants' conduct of a RICO enterprise. With respect to this element, the plaintiffs proceeded on two independent theories: Count I treated the Elevator as the enterprise required by RICO, while Count II substituted the plaintiffs' farms. Like the District Court, we cannot endorse the view that a person who induces a farmer to adopt a new method of protecting against ups and downs in the grain market, and advises the farmer in the use of that method, is thereby conducting the operations of the farm. Dismissal was therefore correct as to Count II. However, as the District Court also held, matters are different with respect to Count I. It may be that FCC and Futures, "in effect, took over . . . how the Buffalo Center [Elevator] marketed its purchasing of grain from local farmers." Amended Complaint at 44. The complaint alleges facts from which a jury could infer that the defendants supervised and directed the marketing activities of Henry Mayland, a managerial employee of the Elevator, in order to maximize commissions received from trades associated with HTA contracts. To direct a business's normal activities is to participate in the conduct of an enterprise within the meaning of RICO. See Reves v. Ernst & Young, 507 U.S. 170, 185 (1993) (RICO extends to those who participate in the operation or management of an enterprise, including outsiders associated with the enterprise who participate in the direction of its activities through a pattern of racketeering activity); Handeen v. Lemaire, 112 F.3d 1339, 1349 n.12 (8th Cir. 1997) (same). We agree with the District Court that, as to

Count I of the complaint, the plaintiffs have sufficiently pleaded conduct of a RICO enterprise by FCC and Futures.

In order for Count I to survive dismissal, however, the plaintiffs must also have adequately pleaded a "pattern of racketeering activity." 18 U.S.C. § 1962(c). In this case, RICO liability is predicated on alleged acts of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. Those offenses consist in the foreseeable use of the mails or wires for the purpose of carrying out a scheme to defraud. Atlas Pile Driving Co. v. DiCon Financial Co., 886 F.2d 986, 991 (8th Cir. 1989). Beyond that, the offense conduct may vary rather widely. "The crime of mail fraud is broad in scope and its fraudulent aspect is measured by a non-technical standard, condemning conduct which fails to conform to standards of moral uprightness, fundamental honesty, and fair play." Id. A plaintiff may, but need not, allege that a defendant made misrepresentations of fact. Murr Plumbing, Inc. v. Scherer Financial, 48 F.3d 1066, 1069 n.6 (8th Cir. 1995). Because misrepresentations of fact are not necessary to the offense, it follows that no misrepresentations need be transmitted by mail or wire: even routine business communications in these media may suffice to make a scheme of false dealing into a federal offense. See, e.g., Atlas Pile Driving, 886 F.2d at 992 ("a mailing [that serves as an element of mail fraud] may be a routine mailing or even one that is sent for a legitimate business purpose so long as it assists in carrying out the fraud") (internal quotations omitted).

In the present case, the offense elements that the District Court held to be insufficiently pleaded are mail and wire communications of just this routine sort. As to wire fraud, for example, the plaintiffs allege that

> As part of the fraudulent scheme, from no later than January, 1993 through April 1996, FCC and FCC Futures made and caused the use of interstate telephone lines to effectuate calls every business day between FCC and FCC Futures and:

-11-

> A. Various Plaintiffs herein to solicit HTA contracts and to confirm Rolls; and
>
> B. With Buffalo Center to place and execute orders for commodity futures contracts reflected in the monthly statements (*see* Exhibit "D" hereto).

Amended Complaint at ¶ 100. The exhibit referred to consists of documents that appear to be copies of monthly statements of the Elevator's account with FCC. As to mail fraud, the plaintiffs similarly allege that

> As part of the scheme, from no later than January, 1993 through April 1996, FCC and FCC Futures caused the mailing of:
>
> A. Commodity statements to Buffalo Center each month from no later than January, 1993 through April, 1996 (*see* Exhibit "D" hereto);
>
> B. A confirmation of each trade reflected on such monthly statements at the time the dates shown [sic] for such transactions;
>
> C. Contracts and roll confirmations by Buffalo Center to each of the Plaintiffs which in turn caused Buffalo Center to enter into corresponding futures positions in its FCC account; and
>
> D. Exhibit "Z" hereto, to over 700 recipients.

Amended Complaint at ¶ 98. Exhibit "Z" appears to be a copy of a flyer advertising a "Market Outlook & Strategy Meeting" relating to HTA contracts and featuring FCC employee Earl Cornelius as a speaker. The exhibit gives dates and locations for the meeting.

The District Court held that both of these sets of allegations suffered from "the same malady." Memorandum Opinion and Order at 44. Again applying the heightened pleading requirement of Rule 9(b), the Court held that the plaintiffs' "bald allegations of [mail and] wire fraud fail to identify the actors or the victims sufficiently for the court to determine whether or not they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " Id. at 45, quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 n.14 (1984). It then dismissed Count I on the ground that a pattern of racketeering activity had not been sufficiently alleged. Id.; cf. Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir. 1994) (stating that "[w]ithout an adequately detailed description of the predicate acts of mail and wire fraud, a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established").

With due respect to the District Court, we find the reference to Sedima somewhat off point. There are two issues here that should be kept distinct: whether the plaintiffs have sufficiently pleaded acts of racketeering, and whether those alleged acts can be said to form a pattern. The District Court was quite correct in applying a heightened pleading standard to the plaintiffs' allegations of fraud. See Murr Plumbing, Inc., 48 F.3d 1066, 1069 ("The particularity requirements of Rule 9(b) apply to allegations of mail fraud . . . and wire fraud . . . when used as predicate acts for a RICO claim."). But that standard applies because the allegations are allegations of fraud, not because particularized allegations are needed in order to determine whether a pattern exists. If the racketeering activity alleged were bribery, for example, Rule 9(b) would not apply, but a court ruling on a motion to dismiss would still have to determine whether there were any facts the plaintiffs could prove that would connect the acts of bribery into a pattern.

Putting aside the question of racketeering, the allegations here satisfy the pattern requirement as glossed in Sedima. The acts imputed to the defendants had a common purpose, namely, to earn profits from trades associated with HTA contracts. Common results and victims are alleged. The participants in the marketing of the HTAs – Cornelius, Mayland, and Mayland's alleged sub-agents – are specifically named and claimed to be connected with each other in specific ways. The methods by which the plaintiffs were allegedly induced to purchase the contracts have many common features, such as the use of marketing meetings and a common set of representations about HTAs. Finally, the plaintiffs have alleged that many such acts occurred in a time frame of just over three years. The complaint clearly depicts something more than a set of "isolated events." Sedima, 473 U.S. 479, 496 n.14. The question remaining, then, is whether the acts alleged constitute racketeering activity, or, more specifically, whether the plaintiffs have sufficiently pleaded mail and wire fraud under the standard of Rule 9(b).

V.

We must interpret the requirements of Rule 9(b) "in harmony with the principles of notice pleading." Gunderson, 2000 WL 1154423 at *3; see also Michaels Bldg. Co. v. Ameritrust Co., 848 F.2d 674, 679 (6th Cir. 1988) ("Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony."); Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984) (application of Rule 9(b) must "take account of the general simplicity and flexibility contemplated by the rules"). The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct. Thus, a plaintiff must specifically allege the "circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and

-14-

what was obtained or given up thereby." <u>Bennett v. Berg</u>, 685 F.2d 1053, 1062 (8th Cir.), <u>adhered to on reh'g</u>, 710 F.2d 1361 (8th Cir. 1982) (en banc), <u>cert. denied</u>, 464 U.S. 1008 (1983); see also <u>Murr Plumbing, Inc.</u>, 48 F.3d at 1069.

In the case at hand, the circumstances we described in <u>Bennett</u> are sufficiently pleaded. The complaint sets forth times and places of numerous meetings, marketing seminars, and private conversations in which misrepresentations are claimed to have been made. It names the parties to those communications and describes the content of the claimed false statements. It names the plaintiffs who allegedly relied on these statements in deciding to begin writing HTA contracts with Buffalo Center Elevator, and it states the specific monetary damage to each plaintiff that is claimed to have resulted from that venture. Indeed, the District Court found no fault with the complaint in these respects. Its decision turned on the element of mail and telephone use, which the plaintiffs pleaded as described above.

We believe, for several reasons, that the function of Rule 9(b) is not well served by a dismissal on that ground. First, as we have already noted, the plaintiffs here do not claim that any misrepresentations were made by mail or telephone. The mail and wire communications alleged here are ordinary business letters and phone calls. These are not "circumstances constituting fraud," except in the sense of satisfying a jurisdictional element of a federal fraud statute. The drafters of Rule 9(b) most likely did not intend to require specific pleading of such facts: when the rule was adopted in 1937, RICO did not exist, and a common-law fraud action in the state courts was the only remedy normally available to private plaintiffs who claimed to have been defrauded through use of the mails or wires. See <u>Sedima</u>, 473 U.S. 479, 501 (Marshall, J., dissenting) (noting the absence of a federal civil action for mail or wire fraud prior to the enactment of RICO). Nor is the rule's purpose advanced by applying it in that way. There is no risk of damage to a defendant's reputation from the claim that he mailed out a commodity-futures account statement or called an account holder on the telephone to confirm a trade. It is settled, as we have already said, that Rule 9(b)

-15-

applies to allegations of mail and wire fraud. But this does not mean that we should apply it in a way that constrains the liberality of notice pleading without advancing the purpose of the rule.

Second, many of the communications at issue are claimed to have taken place between FCC and Futures, or between one of them and the Elevator. As to these uses of the mails and wires, the plaintiffs are surely correct that a court cannot reasonably expect highly specific allegations before allowing at least a brief discovery period. The facts that would have to be alleged are known to the defendants, but the plaintiffs have not yet had a chance to find them out. (This is especially true of telephone calls, which may leave little or no paper trail.) Where a plaintiff is not a party to a communication, particularity in pleading may become impracticable. For that reason, several of our sister circuits have declined to require, before discovery, the pleading of dates and times of communications in furtherance of a scheme to defraud, where the complaint alleges facts supporting the inference that the mails or wires were used. See Seville, 742 F.2d at 792 n.7 (holding that Rule 9(b) does not require a plaintiff to specify, prior to discovery, the place and time of events that connect a defendant's fraud with interstate commerce); Durham v. Bus. Mgmt. Assoc., 847 F.2d 1505, 1510 (11th Cir. 1988) (holding allegation of use of the mails sufficient, where plaintiffs' allegation that "correspondence and other communications concerning [the alleged scheme to defraud] took place through . . . the mails" was supported by an attached affidavit from a recipient describing such correspondence, even though dates and times of mailings were not stated); New England Data Serv. v. Becher, 829 F.2d 286, 292 (1st Cir. 1987) (holding that, although First Circuit precedent requires that dates and times of mail or wire communications be pleaded, it is often "unreasonable" to dismiss a complaint on this basis without first allowing a period of discovery). Here, although the plaintiffs have been allowed to amend their complaint, they have not had the benefit of discovery. We think it only fair to give them that benefit before requiring them to plead facts that remain within the defendants' private knowledge.

Finally, we find merit in the plaintiffs' argument that they have specified the dates and contents of the defendants' mail communications by attaching to the complaint the items they claim were mailed. "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed. R. Civ. P. 10(c). For that reason, a court ruling on a motion to dismiss under Rule 12(b)(6) may consider materials attached to the complaint. Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986). The exhibits to which the plaintiffs refer were explicitly incorporated into Count I. Considering those exhibits as part of the pleading, we believe that the complaint gives the defendants notice of specifically when and how they are claimed to have used the mails in furtherance of a scheme to defraud.

## VI.

While we express no view on the merits of the case, we believe that further proceedings are warranted here. The plaintiffs have sufficiently alleged that Henry Mayland was an agent of FCC for the purpose of soliciting HTA contracts. They have pleaded facts that confer standing under the Commodity Exchange Act. Finally, Count I of the complaint adequately pleads a civil RICO claim based on a pattern of mail and wire fraud. We therefore reverse and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.